UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Arthur Dale Senty-Haugen,

        Plaintiff,

v.

Kevin Goodno, Michael Tessner,
Larry TeBrake, Jerry Zimmerman,
Steve Huot, Dean Mooney, Dr. David Paulson,
Tom Kramer, Dara Johnson, Randy Valentine,
Paula Johnson, Lori Parkos, Debra Konieska,
Jim Lind, Barry Anderson, Al Langhorst,
Brian Nieneman, Brett Skog, Richard O'Connor,
Robert Rose, Mary Lou Foss-Salo, Mary Eckstine,
Kurt Eckstine, Carol Roback, Lorilee Aldrin,
Mary Long, Mary Lichtenberg, Pam Bidelman,
and John Doe and Jane Roe,

        Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 04-1077 ADM/JJG

---

Jordan S. Kushner, Esq., Law Office of Jordan S. Kushner, Minneapolis, MN, argued for and on behalf of Plaintiff.

W. Karl Hansen, Esq., Assistant Attorney General, St. Paul, MN, argued for and on behalf of Defendants.

---

## I. INTRODUCTION

On July 26, 2005, oral argument before the undersigned United States District Judge was heard on Defendants' Motion for Summary Judgment [Docket No. 33]. In his Second Amended Complaint ("Complaint") [Docket No. 17], Plaintiff Dale Arthur Senty-Haugen ("Senty-Haugen" or "Plaintiff"), alleges Defendants[1] violated his Constitutional rights while Plaintiff was committed to the Minnesota Sex Offender Program ("MSOP"). Additionally, Plaintiff alleges a

---

[1] The Motion is made by all named Defendants; hence, they will be collectively referred to as "Defendants" throughout the Order.

number of state law violations against Defendants.  During oral argument, Plaintiff conceded that he had abandoned a number of his claims, including his equal protection claim, his patient's bill of rights claim, violation of the Civil Commitment Act, violation of administrative rules, and violations of the Minnesota constitution.  For the reasons set forth herein, Defendants' Motion for Summary Judgment is granted.[2]

## II.  BACKGROUND[3]

In 1995, Plaintiff was committed to the MSOP as a sexual psychopathic personality and sexually dangerous person by the Ramsey County District Court.  ML[4] 1023-48.  In 1999, Plaintiff was convicted of financial fraud and theft crimes from a fellow MSOP patient, and served the sentence in a state correctional facility.  State v. Senty-Haugen, No. C2-00-1901, 2001 WL 345648 (Minn. Ct. App. Apr. 10, 2001).  After serving his sentence, Plaintiff was returned to the MSOP facility in St. Peter, Minnesota, in May 2002.  On August 25, 2005, Plaintiff was sentenced to 57 months incarceration after Plaintiff pled guilty to six counts of aiding and abetting false claims and conspiracy to defraud the government in connection with a tax fraud scheme.  United States v. Senty-Haugen, No. 04-CR-443, (D. Minn. Aug. 25, 2005) (J. Kyle).

---

[2] Defendant Goodno argues he is an improper defendant because he was not personally involved with any of the relevant facts.  However, because Defendants' Motion is granted in its entirety, Goodno's status will not be discussed.

[3] The record is replete with facts detailing numerous incidents involving Plaintiff during his commitment at the MSOP.  However, as many of the claims in this case have been abandoned, only the facts pertinent to the remaining claims will be detailed here.

[4] "ML" refers to records Bates stamped "Moose Lake" and attached to the Helin Affidavit [Docket No. 39] as Exhibit A.

**A.     Medical History**

When Plaintiff began the second segment of his commitment at the MSOP, he reported with a number of medical conditions, including mild coronary artery disease, hypertension, and hemorrhoids. ML 341-48; 398-401. On August 1, 2002, at 2:00 a.m., Plaintiff contacted the registered nurse on duty, Rose Reule, to complain of chest pain he had been experiencing for approximately a quarter of an hour following a dose of nitroglycerin. ML 296. She gave Plaintiff two additional doses of nitroglycerin and contacted the on-call physician, who ordered Plaintiff to be transferred by ambulance to the St. Peter Community Hospital. Id. Before the ambulance arrived, Plaintiff's pulse became undetectable for a short time. ML 299. Nurse Reule administered oxygen, and the pulse returned. The ambulance arrived at 3:00 a.m. and transported Plaintiff to the local hospital. Soon after arriving, Plaintiff was airlifted to Abbott Northwestern Hospital in Minneapolis, where he underwent a coronary and left ventricular angiogram. The results of the tests were negative. ML 349. Plaintiff returned to the MSOP in St. Peter at 4:00 p.m. the same day.

Plaintiff also experienced problems with hemorrhoids while at the MSOP. On September 27, 2002, Plaintiff saw Dr. Christine Redmann, who prescribed stool softeners and a topical cream for relief of a thrombosed hemorrhoid. ML 1189. In late October 2002, Dr. Redmann referred Plaintiff to a gastroenterologist, Dr. Qazi Khusro, who saw Plaintiff on November 18, 2002. ML 351, 394, 560-61. Dr. Khusro ordered a gastroscopy and colonoscopy, which were performed on January 28, 2003 by Dr. Sabina Khan. The results indicated a hiatal hernia and internal hemorrhoids. ML 351, 547-48, 565, 632-33. In October 2003, Plaintiff was transferred to the MSOP's Moose Lake facility. On November 13, 2003, Plaintiff complained of discomfort

with his recurring anal cyst, and was prescribed Keflex and hot packs.  ML 98, 380-83.  He demanded that Nurse Mary Eckstine lance the cyst, and when she refused, he did so himself. ML 95.  On December 9, 2003, Dr. David Paulson referred Plaintiff for a surgery consult, after which the cyst was removed in February 2004.  ML 380-81, 613-14; Paulson Dep. (Hansen Affidavit [Docket No. 38] Ex. F) at 43-45.

**B.     Safety and Disciplinary Issues**

At both the St. Peter and Moose Lake facilities, Plaintiff was the subject of numerous incidents involving his own safety, the safety of other committed sexually dangerous persons, and MSOP staff.  On January 23, 2003, Plaintiff gave $225 cash to a taxi driver to deliver to a bail bondman to be used as collateral.  Possessing that amount of cash, however,  violated the MSOP limit of $71 for patients.  Following an operational team ("OP team") meeting, MSOP staff then searched Plaintiff's room, finding marijuana and a cell phone (prohibited by internal rules).  ML 261-66.  Plaintiff was given a drug test, which resulted in a positive test for THC. ML 523.  He received 105 days of Level A restrictions as a disciplinary sanction.  ML 260, 723-25.

During the summer of 2003, MSOP staff grew concerned that Plaintiff may have been taking financial advantage of an elderly MSOP patient ("Patient X").  In September 2003, MSOP staff decided to transfer Patient X to reduce his contact with Plaintiff.  Senty-Haugen Dep. (Hansen Aff. Ex. H) at 45-47, 51;  TeBrake Dep. (Hansen Aff. Ex. B) at 55-56.  After Plaintiff and other patients insisted that Patient X be given the requisite seven day notice for a room transfer, MSOP staff decided to allow Patient X to remain in his room.  On October 2, 2003, Defendant TeBrake decided to transfer Plaintiff to the MSOP Moose Lake facility to reduce

Plaintiff's opportunities to financially exploit Patient X. During the transfer to Moose Lake, Plaintiff removed his restraints and made threatening remarks to the transport officers. ML 166, 169.

Plaintiff's arrival at the Moose Lake MSOP facility was also eventful. He initially refused to submit to a strip search, and on his first day at Moose Lake he was seen using two telephones simultaneously for lengthy conversations. ML 166, 168-69, 659. He also gave sealed envelopes to several patients. ML 659. This behavior led to a meeting of his OP team on October 3, 2003. ML 727-32. Plaintiff participated in the meeting, which reviewed the circumstances leading to Plaintiff's transfer from the St. Peter facility to the Moose Lake facility. This behavior included the marijuana that was found in Plaintiff's room and suspicion that Plaintiff was taking financial advantage of an elderly resident. This meeting resulted in an imposition of 30 days of Level A restrictions, including a mail and telephone supervision plan. ML 166-67. On October 9, 2003, Plaintiff was placed in protective isolation status due to concerns regarding the potential financial exploitation of Patient X,[5] and his behavior during his transfer to Moose Lake. ML 158-59, 669-70; Tessner Dep. (Hansen Aff. Ex. A) at 57, 66; TeBrake Dep. at 55-56; Johnson Dep. (Hansen Aff. Ex.C ) at 14-16, 35. The following day, the protective isolation placement decision was approved by the protective isolation review panel. ML 160-61.

On October 15, 2003, Plaintiff was removed by the OP team from protective isolation

---

[5] Additionally, the MSOP staff was concerned that Plaintiff helped organize an attack on Gary Grimm, an MSOP official at the St. Peter facility. The attack closely followed the attempt to move Patient X away from Plaintiff, which Plaintiff and other committed patients opposed. Grimm, asleep in his own home, was awaken by an unknown attacker and beaten with a baseball bat, sustaining severe injuries.

after a reassessment determined the MSOP's criteria for placing a resident in protective isolation had not been met.  ML 1077-78; Johnson Dep. at 19-20.  Instead, the MSOP placed Plaintiff on administrative restrictions, which simulated protective isolation.  Id.  Because Plaintiff did not qualify for protective isolation, Defendant Tessner authored a memorandum outlining the use of administrative restrictions.  Tessner Dep. Ex. 2.  Following the direction of this memorandum, Plaintiff was kept on administrative restrictions until March 12, 2004.  Later in 2004, the Minnesota legislature approved the use of administrative restrictions on patients to maintain safety and security.  Minn. Stat. §§ 253B.02, subd. 24; 253B.03, subd. 1a.  Apparently, up until this legislation was passed, no policy regarding administrative restrictions was formally in place.

In April 2004, Plaintiff twice was placed on short periods of administrative restrictions.  He was first placed on restrictions for passing items to other patients without prior approval, resulting in four days of Level A restrictions.  ML 4532-35.  A few days later, he again violated his program plan by using the laundry room without prior authorization, and was placed on restrictions for three days.  ML 4530-31.  On both of these occasions, Plaintiff received Level A restrictions, which requires patients to be in their rooms by 10:30 p.m.  On April 10, 2004, while on Level A restrictions, Plaintiff refused to enter his room at 10:45 p.m.  Defendant Parkos requested Plaintiff to return to his room.  When he continually refused, she called a Condition Red, which summoned all available staff to Plaintiff's unit.  ML 4503-08.  Plaintiff claims that while the staff approached him to usher him into his room, he was struck by one of the guards.  The next morning, a nurse noted an abrasion and bruising on Plaintiff's face.  ML 4505.

On November 16, 2004, Plaintiff was placed on administrative restrictions in the protective isolation area after indictment on federal charges.  ML 6297, 6312, 6360-61.  On

November 18, 2004, Plaintiff was taken into federal custody. ML 2299.

### III. DISCUSSION

A.      **Standard of Review and Standing**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

Plaintiff's claims for equitable and injunctive relief are moot if he is no longer subject to the confinement conditions of which he complains. An "equitable remedy is unavailable absent a showing irreparable injury, a requirement that can not be met where there is no showing of any real or immediate threat Plaintiff will be wronged again." Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985). Id. Here, Plaintiff is no longer housed at the MSOP and is serving a lengthy federal sentence. As a result, his claims for declaratory and injunctive relief can not be maintained, leaving only his claims for compensatory damages.

**B.     Due Process Violations**

As a threshold matter, the parties disagree as to what standard of review applies to Plaintiff's due process claims. Defendants contend the Court must analyze whether Defendants interfered with a recognized liberty or property interest. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Wilkinson v. Austin, 125 S.Ct. 2384, 2393 (2005); see also Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989). Liberty interests rise from either the Due Process clause or state law. Id. Defendants suggest that the Plaintiff's status as a person committed to a state security hospital for sexually dangerous persons is similar to a pre-trial detainee, who can not be punished without some level of procedural protection. Bell v. Wolfish, 441 U.S. 520, 535 (1979). Bell notes, however, that in the case of pre-trial detainees, a Constitutional violation is not implicated for *de minimis* levels of imposition.

Plaintiff avers that his situation is more analogous to that of an involuntarily committed mentally ill patient. In Youngberg v. Romeo, the Supreme Court set forth a separate due process test for a mentally retarded patient who had been committed to a state institution. 457 U.S. 307 (1982). The Court recognized that committed patients retain liberty interests in "reasonable safety and freedom from physical restraint." Id. at 319. However, these interests are not without limits. The Court recognized that unfettered freedom of movement would not allow institutions to provide reasonable safety for residents. Id. Thus, the Court balanced the individual's liberty interest against the state's reasons for limiting an individual's liberty. Id. at 320. "The Constitution only requires that the courts make certain that professional judgment in fact was

exercised.  It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."  Id. at 321.

Plaintiff also argues that Minnesota state laws provide a liberty interest to Plaintiff.  However, the Supreme Court has carefully circumscribed the interests state laws can provide.  "The touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'"  Wilkinson, 125 S.Ct. at 2394 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).  The Sandin standard requires a determination of whether the alleged violation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Id.  Finally, the Supreme Court has decided that state laws can only create liberty interests that relate to freedom of movement.  Id.  Therefore, Plaintiff's argument that state laws affecting his ability to send and receive mail and governing transfers between MSOP facilities grant him a protected liberty interest can not survive.  Minn. Stat. § 144.651, subd. 31 is the only authority Plaintiff cites which addresses freedom of restraint.  This statute prohibits isolation as discipline to enforce program rules or for the convenience of staff.  Thus, the liberty interest identified by state law – freedom of restraint – is similar to the liberty interest for committed patients set forth in Youngberg.

An MSOP patient is neither a pre-trial detainee nor a committed mentally challenged patient.  However, a determination of which standard better applies is not necessary here.  Even under Plaintiff's analysis, the Defendants' actions in limiting Plaintiff's freedom from restraint – the only identified interest protected by the Constitution – comport with Constitutional

9

requirements. Throughout the relevant time period, the Defendants exercised professional judgment subject to review. Additionally, Plaintiff continued to receive reassessment and evaluation throughout the time period, a factor recently identified by the Supreme Court as an important aspect of due process. Id. at 2394-95. Finally, given the Plaintiff's status as a person committed to a security hospital, it can not be said that the restrictions placed on Plaintiff imposed an atypical or significant hardship on him in comparison to the life of a standard MSOP patient.

Plaintiff endured only one significant stretch of restrictions against his ability to move freely within the MSOP. The restrictions during this time period, along with shorter periods of minor restrictions, were imposed only following the professional judgment of MSOP officials who correctly balanced the safety of other residents and MSOP personnel with the Plaintiff's rights. This judgment was subject to continuous review.

The longest period of restrictions placed on Plaintiff began in October, 2003. Following a meeting on October 3, 2003, in which Plaintiff met with his OP team, Plaintiff was placed on protective isolation status on October 9. However, because it was later decided Plaintiff did not meet the criteria for protective isolation, he was removed from protective isolation on October 15, 2003, and instead placed on administrative restriction. Administrative restrictions differ from protective isolation in that any number of a wide range of privileges afforded to committed patients can be restricted, as opposed to the full isolation of protective isolation. Generally, administrative restrictions are imposed when a resident is suspected of committing a criminal act. In this case, MSOP officials reasonably believed Plaintiff was taking financial advantage of Patient X, and, therefore, met its criteria for administrative restrictions. This was a sound,

professional judgment that was continually evaluated by Plaintiff's treatment team. Although the rationale for administrative restrictions was set forth in a memorandum created to address Plaintiff's situation, this does not necessarily result in a violation of Plaintiff's due process rights. Defendants properly balanced the safety of MSOP staff and residents with Plaintiff's rights.

Plaintiff's restrictions were reviewed by the Protective Isolation Review Panel in October 2003, December 2003, and January 2004. ML 51, 66-67, 158-59, 658-65. Additionally, as further evidence of the process received by Plaintiff, he appeared before the hospital review board on six occasions. ML 4416-32, 6387-89. Indeed, not only was Plaintiff's status continually reviewed, but the restrictions on his freedom to move were incrementally lifted as appropriate, beginning on November 22, 2003. ML 666, 678. By March 12, 2004, the MSOP staff felt that Plaintiff had responsibly handled his increased privileges, and, having learned that he would not likely be charged with a criminal offense out of his behavior involving Patient X in the near future, Plaintiff was removed from administrative restrictions and placed in the regular patient living unit. TeBrake Dep. at 119-21. No evidence has been adduced to demonstrate that the decisions made on behalf of the MSOP were not professionally sound. Although Plaintiff argues the lack of formal criminal charges relating to his involvement with Patient X renders the MSOP's actions violative of his rights, evidence of improper behavior existed, including the fact that Plaintiff had become a named beneficiary of Patient X and had received powers of attorney for Patient X. Senty-Haugen Dep. at 39. Additionally, illegal drugs had been found in Plaintiff's room, and he had threatened staff members. Therefore, MSOP's decisions to place administrative restrictions on Plaintiff's freedom to move within the institution reflects a proper

balance between Plaintiff's liberty interest and the MSOP's goal of maintaining a safe environment for its patients and staff.

Plaintiff's other periods of administrative restrictions, considerably shorter than the one described above, also comport with principles of due process and reflect professional judgment. Following a meeting with his OP team on April 6, 2004, Plaintiff received four days of restrictions for violating his room visiting restrictions and passing items to other patients. ML 4532-33. On April 10, 2004, Plaintiff received an additional three days of restrictions for violating his individual program plan. ML 4530-31. Finally, on November 16, 2004, Plaintiff was placed on restrictions following his indictment on federal charges. ML 6297, 6312, 6360-61. All of these decisions followed meetings with Plaintiff's OP teams, and were based on the professional judgment of MSOP staff. Plaintiff received sufficient process in each instance.

Given the limited liberty interest Plaintiff possessed as a committed sexually dangerous person, as well as the nearly continuous review he was afforded by review panels at the MSOP, no genuine issue of material fact is presented to avoid summary judgment. The record indicates that Plaintiff received due process, and therefore, Defendants' Motion is granted on this count.

**C.     Eighth Amendment Violations**

Plaintiff also alleges that MSOP staff treated his medical concerns with deliberate indifference in violation of his Eighth and Fourteenth Amendment rights. Involuntarily committed patients, like prisoners, are entitled to medical care. Terrance v. Northville Regional Psychiatric Hospital, 286 F.3d 834, 842-43 (6th Cir. 2002). The standard for determining whether the right to care is violated is if the conduct of the official amounts to "deliberate indifference to serious medical needs." Dulany v. Carnahan, 132 F.3d 1234, 1237-38 (8th Cir.

1997).  Demonstration of deliberate indifference requires Plaintiff to prove two elements: 1) that one suffered from an objectively serious medical need, and 2) the defendants knew of the medical need but deliberately disregarded it.  Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004).  Plaintiff alleges that Defendants deliberately disregarded his needs on three occasions: first, when Plaintiff experienced heart problems in August 2002; second, when Plaintiff broke his leg in October 2003; and third, when an anal cyst became inflamed in November 2003.  It will be assumed that all three of these incidents constituted serious medical needs, and only the question of whether MSOP staff deliberately disregarded Plaintiff's needs will be addressed.

On August 1, 2002, Plaintiff experienced chest pain in the early morning hours.  The record reflects that the MSOP staff contacted a doctor in the early hours of August 1 and summoned an ambulance.  Plaintiff argues that he informed the nurse on duty that he had taken nitroglycerin tablets and should have been immediately transported in an ambulance.  He alleges delay caused him to become nonresponsive, requiring the nurse to give him oxygen.  The oxygen restored Plaintiff's pulse, and after the ambulance arrived and transported Plaintiff to the local hospital, he was airlifted to Abbott Northwestern Hospital in Minneapolis for further treatment.  There, he received a coronary and left ventricular angiogram.  The results of the test were negative; as a result, Plaintiff was returned to the MSOP later the same day.

Plaintiff has offered no evidence, beyond his bare assertions, that his calls for help were ignored or that any delay in calling for an ambulance caused him harm.  Plaintiff also asserts he suffered from "heart failure" on August 1, 2002; however, no evidence has been proffered to show that this conclusion is a professional medical diagnosis.  In any event, a review of the undisputed facts indicates that MSOP staff did not act with deliberate indifference.  In fact, the

record indicates that the MSOP nurse responded quickly to Plaintiff's complaints of heart problems, promptly summoned additional help, and assisted him when he became non-responsive. Far from being deliberately indifferent, MSOP staff promptly and properly cared for Plaintiff. With no evidence to suggest any unreasonable delay or deliberate indifference, Plaintiff's claim can not survive.

The second incident Plaintiff cites occurred on October 30, 2003, when Plaintiff broke his leg after repeatedly smashing into his door. After injuring his leg, Plaintiff used his intercom to inform MSOP staff that he was hurt. Defendant Langhorst came to Plaintiff's room, but because Plaintiff was lying in front of the door, he could not see Plaintiff's entire body. Langhorst summoned Defendant Eckstine, a nurse. Because Langhorst and Eckstine could only observe Plaintiff from the limited view of the window in the door, they asked him to shift his body away from the door before they opened it. Although Plaintiff responded that he could not move without significant pain, MSOP staff waited for a half hour until Plaintiff was in full view before opening the door and assisting him. Defendants respond that "the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997). In other words, a deliberate indifference claim can not be maintained without evidence demonstrating the detrimental effect of the delay. Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997). Here, although treatment of Plaintiff's injury was delayed during the time period in which MSOP staff required him to move to a visible position, no evidence has been presented that Plaintiff's injury was exacerbated by the delay. ML 627. Because there is no lack of evidence to suggest the delay, occasioned by the staff's legitimate concern for their safety, resulted in any detriment to the Plaintiff, his claim is

denied.

Finally, Plaintiff claims that his cyst was treated with deliberate indifference. Plaintiff claims the cyst went untreated from November 13 to December 9, 2003. Plaintiff also contends he was forced to lance the cyst himself to relieve the pain, and that surgery was delayed for three months. Again, however, Plaintiff fails to demonstrate that the delay in his surgery was detrimental to his health. The Eighth Amendment, while requiring medical treatment, does not require that the precise treatment requested be provided, nor does it require treatment at the time of the patient's choosing. Sherrer v. Stephens, 50 F.3d 496, 497 (8th Cir. 1994); Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996). Rather, it merely requires an absence of deliberate disregard. Here, insufficient evidence has been presented to suggest that Plaintiff's needs were deliberately disregarded. Although Plaintiff did not receive the treatment at the time he specified, there is no dispute that Plaintiff's cyst was removed. As a result, Plaintiff's claims predicated on the Eighth and Fourteenth Amendments must be dismissed.

**D.      Fourth Amendment Violations**

Plaintiff alleges the Defendants lacked justification to strip search him when he arrived at the Moose Lake institution. Plaintiff alleges that committed individuals are subject to search only within the strictures of the Fourth Amendment. Defendants rely on Bell v. Wolfish, which gives deference to institution officials to conduct searches "that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." 441 U.S. 520, 547 (1979). Although Bell dealt specifically with pre-trial detainees, it confirmed the general notion that patients in secure facilities have a diminished expectation of privacy. Id. at 557. Bell upheld strip searches and visual body cavity searches as reasonable searches designed to detect

contraband. Id. at 560.  Here, the strip search at issue was reasonably related to the safety of MSOP staff and patients, particularly given Plaintiff's recent threats to MSOP staff.

**E.     Excessive Force Claims**

Plaintiff claims the Defendants subjected him to excessive force.  The undisputed evidence, however, does not demonstrate any instances of excessive force.  It is well established in the Eighth Circuit that a Plaintiff may not avoid summary judgment by relying solely on allegations.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).  Here, Plaintiff's own unsupported testimony forms the basis of both of his excessive force claims.  Plaintiff alleges that on October 30, 2003, the day in which he broke his own leg by smashing it repeatedly against his unit door, MSOP staff used excessive force on him when they entered his room.  Specifically, Plaintiff claims Defendants held down and pulled his leg, even though it was clearly broken.  However, Plaintiff presents no evidence beyond his own allegation that this incident occurred.  A review of the medical records do not indicate that any additional trauma beyond that which caused the initial break in his leg.  ML 627.  Additionally, Plaintiff has offered no independent verification of any sort to support his claims.

Plaintiff's claim that he was treated with excessive force on April 10, 2003 is also unsubstantiated.  Plaintiff claims he was struck in the face by MSOP staff while they attempted to get him to return to his room when Plaintiff repeatedly refused requests to do so.  Plaintiff, however, admitted in his deposition testimony that the contact may have been incidental.  Senty-Haugen Dep. at 126-27.  Again, however, Plaintiff has presented no independent verification of this claim.  His only evidence consists of a report the following morning that an abrasion existed on his face.  ML 4505.  This minor incident, which Plaintiff admits may have been incidental,

16

does not qualify as excessive force, particularly in light of his threatening actions in failing to return to his room.

**F.      First Amendment Claim**

Plaintiff's First Amendment claim consists of an allegation that Defendants transferred Plaintiff from St. Peter to Moose Lake in retaliation for Plaintiff's advocating on behalf of Patient X.  Even assuming retaliation claims apply in the context of civilly committed patients, Plaintiff can not meet the burden of demonstrating that but for Defendants' impermissible motivation, the transfer would not have occurred.  <u>Goff v. Burton</u>, 7 F.3d 734, 738 (8th Cir. 1993).  Plaintiff has proffered no evidence to suggest that Defendants' motivation in transferring him was anything other than the stated reason that they wished to distance him from Patient X, who Defendants believed was being taken advantage of by Plaintiff.  With no evidence to support his claim that his transfer to Moose Lake was a result of retaliation for his exercise of the right to free speech, Plaintiff's claim must be dismissed.

**G.      Sixth Amendment Violation**

Plaintiff alleges that MSOP staff interfered with his ability to communicate with his lawyer by repeatedly opening, scanning, and reading his outgoing and incoming legal mail.  Again, beyond Plaintiff's bare assertions, he proffers no evidence that his legal mail was ever confiscated.  Even if Plaintiff's allegation that Defendants' documentation verifies that the legal mail was scanned is accurate, Defendants had a permissible purpose to search Plaintiff's mail for contraband.  <u>Powells v. Minnehaha County Sheriff Department</u>, 198 F.3d 711, 712 (8th Cir. 1999).  Moreover, the right of a civilly committed patient to access the courts is not unfettered, but rather, is limited to having "a reasonably adequate opportunity to present claimed violations

17

of fundamental constitutional rights to the court." Lewis v. Casey, 518 U.S. 343, 351 (1996). Thus, Plaintiff must show that the MSOP's staff hindered his pursuit of a legal claim. Id. Here, Plaintiff does not allege that his access to the courts was actually hindered. In fact, his ability to maintain this lawsuit through counsel evidences his ability to maintain contact with his attorney. The Sixth Amendment claim fails.

**H.    Negligence**

Finally, Plaintiff makes a general allegation of negligence. Plaintiff does not reference any specific act of negligence in this count. To the extent that Plaintiff is alleging any acts of medical negligence, Defendants are correct in asserting that Plaintiff has failed to abide by the certification procedure set forth by Minnesota law for bringing a medical negligence action. Under Minnesota statutes, Plaintiff must serve an affidavit upon Defendants within 180 days of commencing an action that the case has been reviewed by an expert who has found a deviation from the applicable standard of care. Minn. Stat. § 145.682, subd. 4. Failure to comply with expert review results in the dismissal of the cause of action. Minn. Stat. § 145.682, subd. 3. Here, no affidavits regarding expert testimony have been filed or served by Plaintiff. As a result, to the extent his negligence claim alleges medical negligence, Plaintiff's claim will be dismissed.

**I.    Qualified Immunity**

Even if Plaintiff were able to present evidence establishing material factual disputes relating to his many claims, recovery would be barred under the doctrine of qualified immunity. The qualified immunity doctrine shields government officials unless the official knew or should have known that their actions would violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Seigert v. Gilley, 500 U.S. 226, 232 (1991).

The purpose of qualified immunity exists to protect those who do not knowingly violate constitutional or statutory rights. As analyzed previously, Plaintiff has not proffered evidence that Defendants acted with knowledge that their actions violated Plaintiff's constitutional rights. Without such evidence, the qualified immunity doctrine applies to Defendants to bar recovery by Plaintiff.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Docket No. 33] is **GRANTED**; and

2. Plaintiff Dale Arthur Senty-Haugen's Second Amended Complaint is **DISMISSED** [Docket No. 17].

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: November 4, 2005.